**CARLSON MARKETING GROUP, INC., Plaintiff,**

v.

**ROYAL INDEMNITY COMPANY and National Union Fire Insurance Company of Pittsburgh, Defendants.**

No. 04–CV–3368 PJS/JJG.

United States District Court, D. Minnesota.

March 28, 2007.

---

Martin R. Lueck, Daniel W. Berglund, Richard B. Allyn, and Terrence R. Joy, Robins, Kaplan, Miller & Ciresi LLP, Minneapolis, MN, for Plaintiff.

Shaun M. Baldwin, Anthony N. Balice, and Jason M. Craft, Tressler, Soderstrom, Maloney & Priess, LLP; Brian A. Wood and Roseann J. Bour, Lind, Jensen, Sullivan & Peterson, PA, Chicago, IL, for Defendant Royal Indemnity Company.

Matthew J. Fink, Daniel M. O'Brien, Richard H. Nicolaides, and Robert S. Marshall, Bates & Carey, LLP; Charles E. Spevacek and Michael P. McNamee, Meagher & Geer, PLLP, Chicago, IL, for Defendant National Union Fire Insurance Company of Pittsburgh.

## MEMORANDUM OPINION AND ORDER

PATRICK J. SCHILTZ, District Judge.

Plaintiff Carlson Marketing Group ("Carlson") filed this action against two of its excess insurers—defendant Royal Indemnity Company ("Royal") and defendant National Union Fire Insurance Company of Pittsburgh ("National Union")—to determine to what extent each insurer is liable to Carlson for expenses that Carlson incurred in defending and settling two patent-infringement lawsuits. Currently before the Court are five summary-judgment motions, one each by Carlson and Royal, and three by National Union. This is two motions too many by National Union, as the Court has explained elsewhere.[1]

Nonetheless, the Court will address all of the arguments raised by the parties.

The five motions raise only four issues. The main issue is how to allocate certain losses suffered by Carlson among various insurance policies and policy periods. A second issue (closely related to the first) is whether the expenses incurred by Carlson in defending and settling one of the patent-infringement suits should be treated as a single loss or—because the suit involved two patents and (arguably) multiple accused products—as multiple losses. The third issue is whether some of Carlson's losses are really punitive damages and therefore not covered or, if covered, uninsurable under Minnesota law. The final issue is whether the legal expenses incurred by Carlson in defending the underlying patent-infringement lawsuits count against ("erode") the applicable policy limits or instead are payable in addition to the policy limits.

For the reasons given below, the Court rules as follows:

First, all of the expenses incurred by Carlson in defending and settling the *Maritz* lawsuit are attributable to the 1997–1998 policy period. The Court will therefore grant Carlson's motion for summary judgment on this issue, deny National Union's motion for summary judgment on "trigger and allocation," and deny as moot Royal's motion for summary judgment as it relates to this issue.

Second, all of the acts committed by Carlson which gave rise to the *Maritz* lawsuit "involv[ed] the same intellectual right and covered Product" and therefore must be aggregated into a single wrongful act. The Court will therefore grant Carl-

---

1. *Carlson Mktg. Group, Inc. v. Royal Indem. Co.*, Civil No. 04-CV-3368, 2006 WL 2917173, 2006 U.S. Dist. LEXIS 74208, 2006 WL 2917173 (D.Minn. Oct. 11, 2006) [Docket No. 178].

son's motion for summary judgment on this issue.

Third, the $5–million portion of the *Meridian* settlement designated as "enhanced compensatory damages" by Carlson and its insurers is neither covered under Carlson's insurance policies nor insurable under Minnesota law. The Court will therefore grant National Union's motion for summary judgment on this issue.

Finally, under the excess-insurance policy issued by Royal, Carlson's defense costs are payable in addition to the policy limits. The Court will therefore grant National Union's motion for summary judgment on this issue and deny Royal's motion for summary judgment as it relates to the same issue.

## I. BACKGROUND

### A. Underlying Patent Litigation

Carlson seeks indemnification from Royal and National Union for losses Carlson incurred in defending and settling two separate patent-infringement lawsuits, referred to by the parties as the *Maritz* and *Meridian* lawsuits. For the most part, the parties do not dispute that these losses are the *type* of losses covered by the relevant insurance policies. They also do not dispute the essential facts related to those suits.

#### 1. The *Maritz* Lawsuit

In 2002, Maritz, Inc. and a unit of American Express (collectively "Maritz") sued Carlson in federal district court in Missouri for infringing two Maritz patents, U.S. Patent Nos. 5,689,100 (the '100 patent) and 5,956,695 (the '695 patent). *Maritz, Inc. v. Carlson Cos.*, No. 4:02–CV–161 (E.D.Mo.); Pl. Mem. Supp. Mot. Partial S.J. ("Carlson SJM" [Docket No. 83]) App. O. The '100 patent was issued on November 18, 1997, Carlson SJM App. L; the '695 patent was issued on September 21, 1999, Carlson SJM App. M. The earliest possible date on which Carlson could be liable for infringing either patent is therefore November 18, 1997.

Maritz alleged that Carlson infringed its patents by operating incentive programs on behalf of various employers under which the employers rewarded their employees with stored-value cards, such as gift cards and prepaid debit cards. Carlson SJM App. O. Both of Maritz's patents cover systems and methods for limiting the use of such stored-value cards to particular merchants or merchandise—for instance, limiting a prepaid Visa or MasterCard to use at Neiman–Marcus only, rather than to all locations that accept Visa or Master-Card.

Carlson operated a number of different stored-value-card incentive programs, but only one was named in the *Maritz* complaint: the "TravPass" program, under which the award cards could be used only at travel- and dining-related merchants. Carlson SJM App. O at 3; *id.* App. V. Nonetheless, both Maritz and Carlson also litigated over whether a different Carlson program—the "Best of Everything" ("BOE") program, under which the award cards could be used only at high-end merchants, Carlson SJM at 4; *id.* App. V—infringed the Maritz patents. *Id.* App. X at 5; Pl. Reply Mem. Supp. Mot. Partial S.J. ("Carlson Reply" [Docket No. 160]) App. B.

In November 2004, Carlson and Maritz settled the lawsuit. Carlson SJM App. P. Carlson agreed to pay a running royalty of one percent on the amount of money loaded on stored-value cards issued under incentive programs, plus a lump-sum payment of $12 million. *Id.* at 9, 12. By the time Carlson settled the suit, it had incurred $3.385 million in defense costs.

Carlson SJM at 13; *id.* App. F ¶ 18.[2] Neither National Union nor Royal has yet indemnified Carlson for any of these defense or settlement costs. Carlson SJM at 13.

### 2. The *Meridian* Lawsuit

In 2002, Meridian Enterprises Corporation sued Carlson in federal district court in Missouri for infringing U.S. Patent No. 5,025,372 (the '372 patent). *Meridian Enters. Corp. v. Carlson Mktg. Group, Inc.,* No. 4:01–CV–1955 (E.D.Mo.); *see* Nat'l Union Mem. Partial S.J. Enhanced Damages ("NU SJM Enh. D." [Docket No. 92] ) App. A. Like the patents in the *Maritz* suit, the '372 patent covers certain aspects of stored-value-card incentive programs. NU SJM Enh. D.App. A at 1–2.

The case was tried to a jury in February 2004. The jury found in favor of Meridian and awarded it $10.5 million in compensatory damages. *Id.* at 4. The jury also found that Carlson's infringement was willful under 35 U.S.C. § 284. NU SJM Enh. D.App. A at 4. This finding of willfulness authorized the district judge, Judge Catherine D. Perry, to award up to treble damages. In May 2004, Judge Perry awarded enhanced damages equal to the jury's $10.5 million award, for a total award of $21 million. *Id.* at 33. She also entered a permanent injunction against Carlson. *See id.* at 38.

Carlson appealed to the Federal Circuit. *Meridian Enters. Corp. v. Carlson Mktg. Group, Inc.,* Nos. 04–1401 & 04–1554 (Fed. Cir.); *see* Pl. Mem. Opp. NU SJM Enh. D. ("Carlson Opp. Enh. D." [Docket No. 116] )

App. T. On appeal, Carlson argued, among other things, that the Federal Circuit should vacate the judgment because of Judge Perry's failure to recuse herself despite a purported conflict of interest. *See* Carlson Opp. Enh. D.App. V at 3–4. The Federal Circuit held that Carlson was sufficiently likely to prevail on that argument that the district court's injunction should be stayed during the pendency of the appeal. *Id.* at 4.

The Federal Circuit never ruled on the merits of the appeal. In May 2005, just before the case was scheduled for oral argument, Carlson and Meridian settled for $17 million. *Id.* App. W at 7; Carlson Opp. Enh. D. at 5.[3] At the same time, Carlson entered into an agreement with Royal and National Union related to Carlson's settlement with Meridian. *Id.* App. X. The two insurers authorized Carlson to settle with Meridian for up to $18 million, but specified that any amount over $16 million would be paid by Carlson alone. *Id.* at 2. As to the remaining $16 million, Carlson and its insurers agreed to litigate in this action who was responsible for what portion of that amount. *Id.* at 1–3. They also agreed to designate $11 million as "compensatory damages" and the other $5 million as "enhanced compensatory damages." *Id.* at 3.

### B. Insurance Coverage

The details of the parties' coverage disputes will be addressed at great length below. At this point, the Court merely provides a brief introduction to the insur-

---

**2.** Royal agrees that Carlson incurred $3.385 in defense costs in *Maritz. See* Royal Resp. Pl. Mot. Partial S.J. at 2 ("Royal Resp. Carlson SJM" [Docket No. 112] ). National Union does not expressly agree with Carlson on this point, but it also does not seem to disagree. *See* Nat'l Union Mem. Opp. Pl. Mot. Partial S.J. at 4 ("NU Opp. Carlson SJM" [Docket No. 108] ).

**3.** Carlson says in its brief that it settled the *Meridian* suit for $16 million. Carlson Opp. Enh. D. at 5. According to the settlement agreement, however, Carlson and Meridian settled for $17 million. *Id.* App. W at 7. This discrepancy is immaterial for purposes of this order.

ance policies involved in this case and the specific coverage provided under those policies for patent infringement.

### 1. Insurance Policies

Between July 1997 and June 2003 (the period relevant to this action), Carlson purchased three layers of insurance coverage: one primary layer and two excess layers. For its primary coverage, Carlson purchased a Commercial General Liability ("CGL") policy with various endorsements. One of those endorsements, the Intellectual Property Endorsement ("IPE"), covered losses resulting from patent infringement by Carlson. Joint Subm. Stip. Authenticity Policies ("Policy Stip.") Tab 1 at P00015; Tab 2 at P00096; Tab 5 at P00512; Tab 6 at P00636; Tab 8 at P00760.

The policy years generally ran from July 1 of each year to June 30 of the next. From July 1997 through June of 2000— that is, for the policy years 1997–1998, 1998–1999, and 1999–2000—Carlson's primary coverage was provided under policies issued by Reliance National Indemnity Company ("Reliance"). Policy Stip. Tabs 1–3. Coverage for the 1999–2000 policy year was originally provided by Reliance, but responsibility for that policy year was transferred to Lumbermens Mutual Casualty Company ("Lumbermens") as a result of a "novation" endorsement executed by Carlson, Reliance, and Lumbermens in November 2000. *Id.* Tab 4. The novation did not change the terms of the Reliance policy in effect during the 1999–2000 policy year; instead, the novation simply transferred responsibility for claims under that policy from Reliance to Lumbermens. Neither Reliance nor Lumbermens is a party to this suit.

From July 2000 through April 2003— that is, for the policy years 2000–2001 and 2001–2002 and most of the policy year 2002–2003—Carlson's primary coverage was provided under policies issued by Lumbermens. *Id.* Tabs 5–7. Finally, from May through June 2003, Carlson purchased its primary coverage from National Union. *Id.* Tab 8. Thus, for a very short period, National Union was both Carlson's primary insurer and one of Carlson's excess insurers.

Carlson purchased excess insurance for the entire period from July 1997 through June 2003 from defendants Royal and National Union. Royal provided $5 million per year in first-layer excess coverage through an umbrella policy (the "Big Shield Commercial Catastrophe Liability Policy") and associated endorsements. *Id.* Tab 9. National Union provided $44 million per year in second-layer excess coverage through an insurance contract that expressly "follow[s] the terms, definitions, conditions and exclusions"—in insurance lingo, "follows the form"—of Royal's first-layer policy. *Id.* Tab 10 at NU02.

For any particular covered loss, the primary policy must respond first. If that policy's limits are exhausted, Royal's policy must then respond. Finally, if a covered loss exceeds the limits of both the primary policy and Royal's policy, National Union's policy must respond.

### 2. Coverage for Patent Infringement

Before July 1997, the primary policy did not cover losses related to patent infringement. Effective July 1, 1997, however, the primary policy included the IPE, under which Carlson was covered for losses resulting from alleged patent infringement. Policy Stip. Tab 1 at P00015; Tab 2 at P00096; Tab 5 at P00512; Tab 6 at P00636; Tab 8 at P00760. Specifically, Carlson was covered under the IPE for losses resulting from certain IP-related "wrongful acts," defined to include "any violation of a legal right or rights associated with patents." *E.g., id.* Tab 1 at P00017. The IPE was amended from time

to time; some of those amendments will be addressed below.

The IPE provided $1 million in coverage per wrongful act, subject to a $1 million deductible. *E.g., id.* Tab 1 at P00018. This creates what is known in the insurance industry as a "fronting" arrangement: Carlson is technically covered under the primary policy for patent infringement, but because the deductible equals the policy limit, Carlson cannot actually recover any proceeds from the primary insurer. Instead, Carlson will be indemnified—if at all—by its excess insurers once Carlson exhausts the $1 million limit/deductible of the underlying policy. The parties do not dispute that, under the primary policy, defense costs incurred by Carlson in connection with a covered patent-infringement suit erode the policy limits and count against the deductible. Nat'l Union Mem. Partial S.J. Def. Costs at 8–10 ("NU SJM Def. Costs" [Docket No. 63]); Royal Resp. Opp. Nat'l Union Mot. Partial S.J. Def. Costs at 6 ("Royal Opp. Def. Costs" [Docket No. 102]); Pl. Mem. Opp. Nat'l Union Mot. Partial S.J. Def. Costs at 2–3 ("Carlson Opp. Def. Costs" [Docket No. 117]).

## II. ANALYSIS

### A. *Standard of Review and Applicable Law*

A party is entitled to prevail on a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). In considering a motion for summary judgment, a court must assume that the nonmoving party's evidence is true and draw all justifiable inferences arising from the evidence in that party's favor. *Taylor v. White,* 321 F.3d 710, 715 (8th Cir.2003).

The parties seem to agree that Minnesota law governs interpretation of the policies in this case. The Court sees no reason to doubt that conclusion. *See Nat'l Union Fire Ins. Co. of Pittsburgh v. Terra Indus., Inc.,* 346 F.3d 1160, 1164 (8th Cir. 2003) (state law governs insurance policies). Under Minnesota law, the interpretation and construction of an insurance policy is a matter of law for the court. *Watson v. United Servs. Auto. Ass'n,* 566 N.W.2d 683, 688 (Minn.1997); *Caledonia Cmty. Hosp. v. St. Paul Fire & Marine Ins. Co.,* 307 Minn. 352, 239 N.W.2d 768, 770 (1976).

Insurance policies are interpreted according to the same principles that govern the interpretation of contracts generally. *Progressive Specialty Ins. Co. v. Widness ex rel. Widness,* 635 N.W.2d 516, 518 (Minn.2001); *Nathe Bros., Inc. v. Am. Nat'l Fire Ins. Co.,* 615 N.W.2d 341, 344 (Minn.2000). Thus insurance policies must be interpreted to give effect to the parties' intent. *Nathe Bros.,* 615 N.W.2d at 344. Further, insurance policies must be construed as a whole. *Haarstad v. Graff,* 517 N.W.2d 582, 584 (Minn.1994). All terms of an insurance policy must be given effect if possible. *Bobich v. Oja,* 258 Minn. 287, 104 N.W.2d 19, 24 (1960); *Steele v. Great W. Cas. Co.,* 540 N.W.2d 886, 888 (Minn. Ct.App.1995).

If the language of an insurance policy is clear, the policy language must be given its "usual and accepted meaning." *Widness,* 635 N.W.2d at 518. Moreover, the meaning of policy language is assessed against an objective standard: The court asks what a "reasonable person" in the insured's position would have understood by the language. *Canadian Universal Ins. Co. v. Fire Watch, Inc.,* 258 N.W.2d 570, 572 (Minn.1977); *Soo Line R.R. Co. v.*

*Brown's Crew Car of Wyo.,* 694 N.W.2d 109, 113 (Minn.Ct.App.2005).

 Whether an insurance policy is ambiguous is a question of law for the court. *Columbia Heights Motors, Inc. v. Allstate Ins. Co.,* 275 N.W.2d 32, 34 (Minn. 1979); *Brault v. Acceptance Indem. Ins. Co.,* 538 N.W.2d 144, 147 (Minn.Ct.App. 1995). Policy language is ambiguous if it can reasonably be interpreted more than one way. *Am. Commerce Ins. Brokers, Inc. v. Minn. Mut. Fire & Cas. Co.,* 551 N.W.2d 224, 227 (Minn.1996). Ambiguous policy language will be construed against the insurer. *Widness,* 635 N.W.2d at 518. Put another way, all doubts (or, at least, all reasonable doubts) about policy interpretation will be resolved in favor of the policy holder. *Haarstad,* 517 N.W.2d at 584 ("A 'policy should be construed as a whole with *all doubts* concerning the meaning of language employed to be resolved in favor of the insured.'" (quoting *Canadian Universal,* 258 N.W.2d at 572) (emphasis added)); *Brault,* 538 N.W.2d at 147 ("The general rule provides that *any reasonable doubt* as to the meaning of the language of an insurance policy is resolved in favor of the insured." (emphasis added)).

### B. Allocation of Maritz Losses

The most difficult and consequential issue before the Court is how to allocate among the various policies and policy periods the losses that were sustained by Carlson in defending and settling the *Maritz* suit—losses that relate to seven years of alleged infringement. The *Maritz* suit involved alleged infringement by Carlson from November 1997 (when the patent was issued) through November 2004 (when the case was settled). The IPE in the primary

policy was in effect from July 1997 through June 2003—that is, for all but the last 17 months of the seven-year period of infringement. How, then, should losses caused by that infringement be allocated? The three parties take three different positions.

#### 1. The Parties' Contentions

Carlson moves for summary judgment on this issue, in effect asking this Court to rule that all of the losses that Carlson incurred in defending and settling the *Maritz* lawsuit should be allocated to a single policy period. Carlson SJM at 28–29. (The question of *which* policy period is a separate issue and is addressed below.) On this theory, Carlson would be obligated to pay only one deductible, and Carlson's excess insurers (Royal and National Union) would each be obligated to pay up to only one policy limit. Responsibility for the almost $15.4 million that Carlson spent to defend and settle the *Maritz* lawsuit thus would be allocated as follows: Carlson would be responsible for $1 million (a single $1-million deductible), Royal would be responsible for $5 million (a single $5-million policy limit), and National Union would be responsible for the rest (about $9.4 million).[4]

Royal agrees with Carlson on this issue. Royal Resp. Pl. Mot. Partial S.J. at 2 ("Royal Resp. Carlson SJM" [Docket No. 112]). Royal also asserts that, entirely apart from the merits of Carlson's arguments, Royal's exposure for the *Maritz* suit is limited to one $5-million annual policy limit based on a non-cumulation clause in the Royal umbrella policy. *Id.* at 2–3. Royal has moved separately for summary judgment on this issue. *See* Royal

---

4. This allocation assumes not only that all of Carlson's losses should be allocated to a single period, but also that (as both Carlson and Royal advocate) defense costs erode Royal's policy limits. As explained below, however, the Court finds that Carlson's defense costs do *not* erode Royal's limits.

Mem. Supp. Mot. Partial S.J. Policy Limits at 20–26 ("Royal SJM" [Docket No. 87]).

Not surprisingly, National Union—who, under Carlson's and Royal's theories, gets stuck paying most of the *Maritz* losses—opposes Carlson's and Royal's motions. National Union has filed its own summary-judgment motion, asking this Court to rule that Carlson's losses must be allocated across *several* policy periods. Nat'l Union Mem. Supp. Mot. Trigger & Alloc. ("NU SJM Trigger") [Docket No. 75]. According to National Union, for each period during which Carlson engaged in loss-producing activity (i.e., patent infringement), the primary policy that was in effect during that period—and, if reached, the excess policies that were in effect during that period—must respond and cover the losses that resulted from Carlson's activities during that period. On this theory, Carlson would pay multiple $1–million deductibles—one for each policy period. To the extent that more than $1 million in losses occurred during a particular policy period, Royal would then be responsible up to its policy limit of $5 million. National Union would not have any liability unless losses attributed to infringing activity during a single one-year policy period exceeded $6 million. The bottom line is that, under National Union's theory, Carlson and Royal would each be responsible for roughly half of the *Maritz* losses, and National Union would pay nothing.

National Union's argument is based primarily on Minnesota law governing generic CGL insurance. Carlson's and Royal's arguments, by contrast, are based on the specific language of the relevant insurance policies. Because that language is the primary source of the rights and duties of Carlson and its insurers, the Court begins its analysis there.

## 2. Policy Language Regarding Aggregating "Wrongful Acts"

The primary policy covers patent-infringement liability through the IPE. During all but one of the policy periods (2002–2003), the language of the key provisions of the IPE was identical. The Court will focus on this language, and then address the 2002–2003 policy period.

Two provisions of the IPE are at issue. The first, Subsection A, generally sets out the primary insurer's coverage obligations as follows (relevant definitions from other sections of the IPE are quoted in brackets):

> We shall reimburse the Insured for those sums which the insured becomes legally obligated to pay and shall have paid as "Damages" resulting from any "Claim" or "Claims" ["a demand for Damages"] made against the Insured for any *"Wrongful Act"* ["any violation of a legal right or rights associated with patents"] caused by [the] manufacture, use, development, distribution, advertising or sale of a "Covered Product" ["any product . . . sold or any process used . . . by the Insured"] committed by the Insured *. . . occurring within the term of this policy.*

Policy Stip. Tab 1 at P00015–17; Tab 2 at P00096–98; Tab 5 at P00512–13; Tab 8 at P00760–61.

According to National Union, this clause is unambiguous. Nat'l Union Mem. Opp. Pl. Mot. Partial S.J. at 8–15 ("NU Opp. Carlson SJM" [Docket No. 108]); *see also* NU SJM Trigger at 18–19. By its terms, Subsection A covers damages resulting from wrongful acts (like patent infringement) "occurring within the term of this policy." Thus, each annual primary policy (e.g., the policy covering 1998–1999) covers only wrongful acts that occur during the term of that policy (e.g., during 1998–

1999). Put differently, each wrongful act in a multi-year series of wrongful acts is covered by one and only one policy: the annual policy that was in effect when the wrongful act occurred.

If the IPE included *only* Subsection A, the Court would agree with National Union. But National Union ignores another provision of the IPE—Subsection E. Under Subsection E, at least some wrongful acts are aggregated with other wrongful acts for coverage purposes. Subsection E provides:

> Regardless of the year in or policy under which "Claims" ... are made, any covered "Wrongful Act" which is the subject of a "Claim" ... involving the Insured and involving the same intellectual right and covered Product as any other "Wrongful Act" [s]hall be considered as a single "Wrongful Act[.]"

Policy Stip. Tab 1 at P00016; Tab 2 at P00097; Tab 5 at P00512; Tab 8 at P00760. All parties agree that under Subsection E, *some* wrongful acts must be aggregated, but they disagree as to which ones.

National Union focuses on the word "covered." NU Opp. Carlson SJM at 10. Because Subsection E applies to "any *covered* Wrongful Act," the Court must (on this argument) look back to Subsection A to determine which wrongful acts are "covered." Since Subsection A covers only wrongful acts "occurring within the term of the policy," Subsection E can *aggregate* only wrongful acts occurring during a single period. Thus, according to National Union, Subsection E mandates that all related wrongful acts that occurred during the policy period 1998–1999 are aggregated into a single wrongful act, and all related wrongful acts that occurred during the

policy period 1999–2000 are aggregated into a single wrongful act, but the wrongful acts that occurred during the policy period 1998–1999 are *not* aggregated with the wrongful acts that occurred during the policy period 1999–2000.

The problem with National Union's argument is that it begs the question—that is, it assumes as true what it ostensibly proves. National Union's argument depends on the notion that only acts occurring within the policy period are "covered." But if the very *function* of Subsection E is to consolidate extra-period acts with intra-period acts, the consolidated extra-period acts would become, constructively, intra-period acts—and thus be "covered" under the policy.

Carlson does not make this point. Instead, Carlson downplays the word "covered" in favor of Subsection E's introductory prepositional phrase, "Regardless of the year in or policy under which 'Claims' ... are made...." Carlson SJM at 26–27; Carlson Reply at 4. Relying on this language, Carlson characterizes Subsection E as an "anti-stacking" or "deemer" clause.[5] Carlson SJM at 8.

An anti-stacking clause of the type at issue in this case is designed to assign losses that occur over several policy periods to a single period for coverage purposes, thus preventing "stacking" of policy limits. *See* 12 *Couch\* on Ins.* § 169:5 (3d ed.2005) (discussing stacking the limits of policies covering different time periods). Frequently such a clause will protect insurers, not policy holders, because it reduces an insurer's total exposure to a single policy limit. In practice, however, an anti-stacking clause could also benefit the policy holder because it reduces the num-

---

**5.** National Union offers a third term: "telescope" clause. NU Opp. Carlson SJM at 12. Because these three terms are more-or-less synonymous, the Court will generally use only the term "anti-stacking" clause.

ber of deductibles that the policy holder must pay. Which party will benefit from an anti-stacking clause—the insurer or the policy holder—will depend on the size of the covered loss, the amount of the deductibles, and the policy limits for each possibly relevant period.

Reading Subsection E as an anti-stacking clause, Carlson argues that all related wrongful acts, "[r]egardless of the year in or policy under which 'Claims' ... are made," must be grouped together and considered a single wrongful act. In other words, as Carlson reads it, Subsection E mandates that a wrongful act that occurred during the policy period 1998–1999 is aggregated not only with related wrongful acts that occurred during that policy period, but also with related wrongful acts that occurred during the 1999–2000 policy period, the 2000–2001 policy period, and every other relevant policy period. Thus, Carlson is required to pay only a single $1–million deductible, Royal is required to pay only a single $5–million policy limit, and National Union is required to pay only a single $44–million policy limit. Carlson SJM at 26–28.

The Court finds the language of both Subsection A and Subsection E to be ambiguous. Indeed, because Subsection E was carelessly drafted, it is literally meaningless. Subsection E's purpose is undoubtedly to aggregate multiple wrongful acts, but grammatically it fails to do so. The clause provides that "any covered Wrongful Act"—singular—"shall be considered as a single Wrongful Act"—also singular. Apparently *"any* covered Wrongful *Act"* should have been written *"all* covered Wrongful *Acts."*

Subsection E would require substantial redrafting to conform unambiguously to either party's proposed interpretation. If National Union is right, Subsection E should read:

> All Wrongful Acts that occur during the term of this policy and that involve the same intellectual right and covered product shall be considered a single Wrongful Act.

If Carlson is right, Subsection E should read:

> All Wrongful Acts that involve the same intellectual right and covered product, whether those acts occur during or outside the term of this policy, shall be considered a single Wrongful Act.

But Subsection E says neither of these things. And when Subsection E is read together with Subsection A, the IPE is ambiguous enough to support either National Union's interpretation or Carlson's interpretation. Because the IPE is ambiguous, the Court must turn to Minnesota law on interpreting ambiguous insurance contracts.

### 3. The *Contra Proferentem* Canon

■ The general rule in Minnesota is that ambiguity in an insurance contract is construed against the insurer—the *contra proferentem* canon.[6] *See, e.g., Widness,* 635 N.W.2d at 518; *St. Paul Fire & Marine Ins. Co. v. MetPath, Inc.,* 38 F.Supp.2d 1087, 1091–92 (D.Minn.1998). In an alternative formulation, ambiguity is construed in favor of finding coverage. *Nordby v. Atl. Mut. Ins. Co.,* 329 N.W.2d 820, 822 (Minn.1983). In general, both formulations of the rule have the same effect. But in a case such as this—involv-

---

**6.** No party asks us to apply this canon because all parties contend that the IPE is unambiguous. NU Opp. Carlson SJM at 15; Carlson SJM at 26–28; Royal Resp. Carlson SJM at 2 (agreeing with Carlson's contentions). But because *contra proferentem* is an established principle of Minnesota law, the Court must apply the canon, whether or not the parties ask the Court to do so.

ing, as it does, anti-stacking clauses—construing ambiguity "against the insurer" can lead to a different result than construing ambiguity "in favor of coverage." For that reason, it is difficult to apply the *contra proferentem* canon in a principled way in this (or any similar) case.

To illustrate: Suppose an insurance policy has a $4–million limit and a $2–million deductible. If the policy holder suffers losses of $1 million per year for four consecutive years ($4 million total), the insurer would prefer that the losses be allocated to each policy year and that the policy limits for each year be stacked. In that event, the insurer would never be liable. Although the total loss across all four years is $4 million, the loss for any particular year is only $1 million, all of which the policy holder would absorb through the yearly deductible. The policy holder, by contrast, would prefer that all losses be allocated to a single policy year, because after payment by the policy holder of a single $2–million deductible, the insurer would be on the hook for the remaining $2 million in damages.

Suppose, though, that under the identical policy, the policy holder instead suffers losses of $4 million per year for four consecutive years ($16 million total). Now the policy holder would prefer stacking while the insurer would prefer that all losses be allocated to a single policy year. If losses were allocated to one year, the insurer would pay $2 million (its $4–million policy limit less the $2–million deductible), while the policy holder would absorb $14 million (the $2–million deductible plus the $12 million in losses exceeding the policy limit). But if losses were allocated to all four policy years, the insurer would pay $8 million ($2 million per year for four years) as would the policy holder (a $2–million deductible per year for four years).

What would it mean to construe such a hypothetical policy "against the insurer"? There is no way to know in advance. Only after the size and timing of the losses were known would it be possible to determine whether the insurer would prefer stacking. But this would mean that identical language in the hypothetical policy would be construed differently in two cases presenting different facts.

This possibility of varying outcomes is defensible if the purpose of the *contra proferentem* canon is to place the risk of sloppy drafting (or strategic ambiguity) on the insurer. *See Safeco Ins. Co. v. Lindberg*, 380 N.W.2d 219, 222 (Minn.Ct.App. 1986) ("The insurer drafted this policy. It had the opportunity to clearly identify coverage and exclusions. It did not do so. Thus, it must bear the consequences."), *aff'd* 394 N.W.2d 146 (Minn.1986); *see also* Richard A. Posner, *The Law and Economics of Contract Interpretation*, 83 Tex. L.Rev. 1581, 1608 (2005) ("The doctrine of *contra proferent[e]m* may still be a sensible tiebreaker, on the ground that the party who drafted the contract was probably in the better position to avoid ambiguities."). *Cf.* Michael B. Rappaport, *The Ambiguity Rule and Insurance Law: Why Insurance Contracts Should Not Be Construed Against the Drafter*, 30 Ga. L.Rev. 171 (1995). At the same time, though, the possibility of such variance conflicts with the general principle that the same contractual language should be interpreted consistently across cases. *See* Restatement (Second) of Contracts § 211(2); Rappaport, 30 Ga. L.Rev. at 180 n. 17; *see also Mich. Chem. Corp. v. Am. Home Assur. Co.*, 728 F.2d 374, 380 n. 7 (6th Cir. 1984) ("[O]nce courts establish a legal rule, such as how the number of occurrences [under an insurance policy] is to be determined, any party is entitled to rely upon that rule in future litigation."); *Am. Commerce Ins. Brokers*, 551 N.W.2d at 229–30

(criticizing on public-policy grounds a proposed interpretation of insurance-policy language about aggregating acts of embezzlement where the interpretation would have benefitted the policy holder in that case but harmed policy holders given different facts).

Moreover, construing this hypothetical policy in favor of coverage could, depending on what "coverage" means, result in a different outcome than construing the policy against the insurer. At least one court has held, in a case involving multi-year losses, that construing an ambiguous policy "in favor of finding coverage" meant allocating those losses to multiple policy periods—that is, stacking. *Olin Corp. v. Certain Underwriters at Lloyd's London*, 468 F.3d 120, 129–32 (2d Cir.2006). The court in *Olin* observed that stacking under the circumstances of that case disadvantaged the *insured*, but the court did not think that this militated against its application of New York's *contra proferentem* canon requiring that ambiguity be construed to "find coverage." *Id.* at 129 n. 6 ("We acknowledge that generally the policy of construing provisions in favor of coverage benefits the insured and not the insurer. We find nothing in the case law to suggest, however, that we should employ a different rationale simply because of the anomalous circumstances in this case that result in the insurer defendant benefitting from finding coverage." (citation omitted)). But it is hard to understand why an ambiguous policy should be construed in favor of "coverage" (taken to mean "number of available policy limits") if that construction harms the policy holder, who is the victim, not the author, of the ambiguity.

In this case, applying the *contra proferentem* canon—whether that means construing the policy against the insurer or in favor of coverage—is difficult for the additional reason that this case involves both primary and excess coverage. It is the IPE that is ambiguous. But the IPE is part of the primary policy, and the primary policy provides only "fronting" coverage (because Carlson's deductible equals its policy limit). In other words, the primary carrier—which is responsible for drafting the ambiguous IPE—will never actually have to indemnify Carlson for losses under that IPE, no matter how the IPE is construed. To some extent, then, the primary insurer is indifferent as to whether IP damages are allocated to a single policy period or spread across several periods.

The primary carrier is not *entirely* indifferent, though. It would likely prefer stacking—that is, it would prefer that multi-year losses for patent infringement be counted against multiple policies. In that way, the IP-related losses absorbed by Carlson would erode more of the primary carrier's aggregate policy limits. In other words, if seven years of infringement by Carlson were treated as a single wrongful act, the primary carrier's aggregate exposure would be reduced by only $1 million. But if the same seven years of infringement were treated as seven wrongful acts (one for every policy year), then the primary carrier's aggregate exposure would be reduced by $7 million. Either way, the primary carrier would not have to pay any money to Carlson, but the latter interpretation leaves the carrier in a better position than the former. So to the extent that the *contra proferentem* canon applies to the "dispute" between Carlson (who is a party) and the primary carrier that drafted the ambiguous IPE (who is not a party), the canon favors Carlson's position that the *Maritz* losses should be allocated to a single policy period.

That said, the Court is reluctant to rule in Carlson's favor based solely on the *con-*

*tra proferentem* canon, given the difficulties of applying that canon under the circumstances of this case. But, as the Court will now explain, when the canon is considered together with evidence of how the language of the IPE changed over time, it becomes clearer that Carlson's losses should be allocated to only one policy period.

### 4. Changes in the IPE

Lumbermens became Carlson's primary carrier in 1999. For the 1999–2000 policy year, Lumbermens provided coverage under the terms of a policy that had been issued by Reliance. Beginning in July 2000, Lumbermens covered Carlson under Lumbermens-issued policies, but the IPE in those policies was almost identical to the IPE that had appeared in the Reliance policies. That changed in July 2002, when Lumbermens amended the IPE significantly.

First, Lumbermens amended Subsection A. Instead of covering losses from "any 'Wrongful Act' ... occurring within the term of this policy," Subsection A was amended to cover losses from "any 'Wrongful Act' ... which *first occur* [sic] during the term of this policy." Policy Stip. Tab 6 at P00636 (emphasis added). Second, Lumbermens made a corresponding amendment to Subsection E. Lumbermens retained all of the language in the Reliance IPE (some typos included) but added a clause at the end of the section as follows (new language in italics):

> Regardless of the year in or policy under which "Claims" ... are made, any covered "Wrongful Act" which is the subject of a "Claim" ... involving the insured and involving the same intellectual right and "Covered Product" as any other "Wrongful Act" [s]hall be consid-

ered as a single "Wrongful Act" *and shall be covered only under the policy covering the period during which the "Wrongful Act" first occurred.*

Policy Stip. Tab 6 at P00636 (emphasis added).

All of the parties agree that the 2002 Lumbermens version of Subsection E—whether it is called an anti-stacking or deemer or telescope clause (*see supra* note 5)—aggregates acts from multiple policy periods into a single act covered only under the policy in effect when the first of the aggregated acts took place. National Union argues that the Lumbermens amendment reveals that Carlson and its insurers knew how to aggregate acts across policy periods when they wanted to. NU Opp. Carlson SJM at 14. Thus, according to National Union, the fact that Subsection E of the 2002 Lumbermens IPE is so clearly an anti-stacking clause is compelling evidence that Subsection E of the Reliance IPE (which, as noted, appeared in Reliance and Lumbermens policies from July 1997 until July 2002 [7]) is *not* an anti-stacking clause.

The Court disagrees. In the Court's view, the changes that Lumbermens made—and, more importantly, did *not* make—to the Reliance IPE hurt National Union more than they help. First, the grammatical subject of the sentence making up Subsection E of the Lumbermens IPE is "any *covered* 'Wrongful Act' "—exactly as it is in Subsection E of the Reliance IPE. Yet according to National Union, the same adjective "covered" in this same noun phrase in the Reliance IPE dictates that Subsection E cannot operate to aggregate extra-period and intra-period acts. The better view is that the phrase

---

7. For the sake of clarity, the Court will refer to the IPE that existed in Carlson's primary policies from July 1997 through June 2002 as the "Reliance IPE," even though the IPE appeared in policies issued by Lumbermens from July 2000 through June 2002.

"any covered 'Wrongful Act'" does not rule out aggregating extra- and intra-period acts under the Reliance IPE any more than it does under the Lumbermens IPE.

Second, given how slightly Subsection E was changed by Lumbermens, it is hard to see how Subsection E of the Lumbermens IPE could be an anti-stacking clause (as the parties agree it is) if Subsection E of the Reliance IPE was *not* an anti-stacking clause (as National Union argues). Lumbermens changed Subsection E in only one respect: Lumbermens designated *a particular policy period*—the one during which the first wrongful act occurred—as the policy period to which the aggregated wrongful acts should be assigned. But the *aggregating* is accomplished by language that is carried over unchanged from the Reliance IPE. This is strong evidence that the Reliance IPE *did* aggregate intra-period and extra-period acts into one period but simply failed to specify *which* period. Lumbermens corrected that omission in 2002.

National Union, however, argues that a clause cannot be an anti-stacking clause if—like Subsection E of the Reliance IPE—the clause fails to specify to which policy period the aggregated losses should be assigned. NU Opp. Carlson SJM at 12–13. According to National Union, one of the "hallmarks" of anti-stacking clauses is that they specify which policy period should receive aggregated losses. *Id.* at 12. Such specificity may be a hallmark of better-drafted, complete anti-stacking clauses. But other endorsements from the Reliance policy itself indicate that insurers sometimes draft incomplete anti-stacking clauses.

The *1997* Reliance policy includes, in addition to the IPE, an endorsement that provides professional-liability insurance. Policy Stip. Tab 1 at P0023–26. A clause in Section IV of that endorsement governs "related acts claims." That clause defines "interrelated and/or related wrongful acts" and provides that "whenever occurring [they] shall be considered as one (1) wrongful act...." *Id.* at P00026. That same clause also says that claims based on related wrongful acts "shall be deemed made within the policy period in which the earliest of such wrongful acts occurred...." *Id.* There can be no doubt, then, that Section IV of this endorsement includes a classic anti-stacking clause.

The *1998* Reliance policy includes an endorsement for employment-practices liability not found in the earlier policy. Policy Stip. Tab 2 at P00104–06. Like the professional-liability endorsement in the 1997 policy, the employment-practices-liability endorsement in the 1998 policy includes a section titled "related acts claims." In that section, "interrelated and/or related wrongful acts" are defined exactly as they are defined in the 1997 professional-liability endorsement, down to the provision that such related acts "whenever occurring shall be considered as one (1) wrongful act[]...." *Id.* at P00106. But the 1998 employment-practices-liability endorsement omits the language from the 1997 professional-liability endorsement about *when* events should be deemed to occur. Given that both endorsements include identical language that indisputably requires the aggregation of related acts, only one explanation makes sense: The 1997 professional-liability endorsement includes a complete anti-stacking clause, while the 1998 employment-practices-liability endorsement includes an incomplete anti-stacking clause.

In short, a comparison between the 1997 professional-liability endorsement and the 1998 employment-practices-liability endorsement demonstrates that Reliance inserted incomplete anti-stacking clauses into its policies. It is thus not startling

that the Reliance IPE also contained an incomplete anti-stacking clause—that is, a clause that *did* aggregate related acts (both intra-period and extra-period) into a single wrongful act, but that failed to assign the resulting single wrongful act to a particular policy period. Moreover, the incomplete anti-stacking clause in the employment-practices-liability endorsement—just like Subsection E of the IPE—was revised by Lumbermens in 2002 to cure this omission by including explicit "deemer" language. *Id.* Tab 6 at P00639.[8]

Finally, recall that National Union took over from Lumbermens as Carlson's primary insurer in May 2003. Subsection E of the IPE in the National Union policy is identical to Subsection E in the Reliance policy. *Compare id.* Tab 1 at P00016 *with id.* Tab 8 at P00760. In other words, the "deemer" language that was added to the Reliance IPE by Lumbermens in 2002 was stripped out by National Union in 2003. But National Union has presented no evidence that it intended to provide substantively different IP coverage under its 2003 policy than Lumbermens did under the 2002 policy. Occam's razor counsels us to look for the simplest explanation. Here, the simplest explanation for the change is that National Union considered the Lumbermens language and the Reliance language essentially equivalent. It therefore saw no reason to carry the Lumbermens language forward.[9]

5. Royal's Non–Cumulation Clause

Royal argues that, entirely apart from how the IPE should be construed, its ex-cess-insurance policy includes a non-cumulation clause that caps Royal's liability at a single policy limit. Royal SJM at 20–26; Royal Resp. Carlson SJM at 2–3. The clause, entitled "Prior Insurance and Non–Cumulation of Liability," reads:

> It is agreed that if any loss is also covered in whole or in part under any other excess policy issued to the Insured prior to the inception date hereof, the Company's limit of liability as stated in the Declarations shall be reduced by any amounts due to the Insured on account of such loss under such prior insurance.

Policy Stip. Tab 9 at R105.

If Royal had issued a series of one-year policies each including this clause, the Court would be inclined to agree with Royal. But Royal initially issued its policy for the three-year "policy period" from July 1, 1992 to July 1, 1995. *Id.* at R001. It appears that the policy was then renewed, rather than reissued, through 2003. *See id.* at R001 (showing policy number HN 005285 on original declarations form), R002 (listing policy number RHN005285 on declarations form effective July 1, 2002).

By its terms, the non-cumulation clause applies only if losses were covered under an excess policy issued "prior to the inception date hereof." Royal argues, in effect, that each annual renewal created a new inception date. Royal Reply Supp. Mot. Partial S.J. Policy Limits at 9–15 [Docket

---

**8.** The "Related Acts Claims" section of the 2002 Lumbermens employment-practices-liability endorsement reads: "Any Wrongful Act having a common nexus of any fact, circumstance, situation or event with another Wrongful Act or Wrongful Acts shall be considered as one (1) Wrongful Act and shall be deemed to occur first and only during the policy period in which the first Wrongful Act arises." Policy Stip. Tab 6 at P00639.

**9.** Actually, an even simpler explanation is that National Union's policy drafters had no idea what they were doing. If so, it would make sense to apply the *contra proferentem* canon against National Union. As to this policy period, National Union was the primary insurer *and* an excess insurer, so applying the canon is less complicated than it is as to other periods.

No. 158]; S.J. Hr'g Tr. at 22:18—25:2, Oct. 10, 2006 (rough draft, attached hereto as Appendix A). But the Minnesota Court of Appeals rejected a similar argument in *Safeco Insurance Co. v. Lindberg*, 380 N.W.2d 219 (Minn.Ct.App.1986). The insurer in that case argued that "inception refers to the first day of a renewal period." *Id.* at 221. The court disagreed, after reading the policy at issue in light of the general rule that " '[w]hether the renewal of a policy constitutes a new and independent contract or continuation of the original contract primarily depends upon the intention of the parties as ascertained from the instrument itself.' " *Id.* (quoting 18 *Couch on Ins.* § 68.40 (2d ed.1983)).

Here the "instrument itself"—the Royal policy—indicates that each renewal was the continuation of the original policy, not a new policy. The policy does not define the term "policy period," but all of the declarations from various years feature policy number RHN005285 (if they feature a number at all), the same number that appears on the original declarations page. *See, e.g.,* Policy Stip. Tab 9 at R001, R034, R054, R093. Moreover, not only do the "Schedule of Underlying Insurance" pages from 1995 through 2002 bear the same policy number (RHN005285), but the schedules for these different years are numbered sequentially as "Revision 1" through "Revision 9." *Id.* at R002–18.

The Court finds, therefore, that Royal's policy has only one inception date—July 1, 1992—and the non-cumulation clause does not cap Royal's liability at a single policy limit because the *Maritz*-related losses are not "covered in whole or in part under any other excess policy issued to the Insured prior to [July 1, 1992]." Nonetheless, Royal's exposure *is* limited to a single policy limit in light of the Court's ruling with respect to the IPE.

■ In sum, the Court agrees with Carlson that, under the IPE, the *Maritz*-related losses must be aggregated into a single policy period. Carlson is responsible for paying a single $1–million deductible per related wrongful act; it more than satisfied this responsibility by paying $3.385 million in defense costs. As to the $12 million Carlson paid to settle the *Maritz* lawsuit (i.e., setting aside defense costs), Royal is responsible for paying a single $5–million policy limit per related wrongful act, and National Union is responsible for the rest. The Court will therefore grant Carlson's motion for summary judgment on this issue, deny National Union's motion for summary judgment on "trigger and allocation," and deny as moot Royal's motion for summary judgment as to this issue.

### 6. Assigning a Policy Period

Having found that the *Maritz*-related losses must be aggregated into a single policy period, the Court must now decide to *which* policy period the losses must be assigned.

The 2002–2003 period can quickly be eliminated as a candidate. The Lumbermens IPE—as amended in 2002—plainly excludes coverage, since the series of acts underlying the *Maritz* suit (and aggregated by virtue of the IPE) "first occurred" in 1997.

As to the remaining periods, Carlson's position is not entirely clear. On the one hand, Carlson argues in one of its briefs both that the *Maritz* losses "trigger[ ] a single limit and deductible" and that "six policy periods are triggered and damages can be allocated accordingly." Carlson Reply at 8. The Court fails to understand what it would mean to allocate damages across several periods while applying only a single limit and deductible. On the other hand, at the summary-judgment hearing,

Carlson seemed to say that because both Royal and National Union provided the same coverage with the same policy limits throughout the period from July 1997 to June 2003, it makes no difference to which policy period the *Maritz* losses are allocated. S.J. Hr'g Tr. at 42:11–16, Oct. 10, 2006 (rough draft, attached hereto as Appendix B) ("Carlson doesn't care what policy they put it in. Carlson doesn't say it should be allocated across the six policies.... [T]he court doesn't have to reach that issue in this case."). The Court, however, has interpreted the IPE to aggregate losses in part because the Court concluded that the 2002 Lumbermens IPE made explicit what was already implicit in the Reliance IPE. Moreover, the Court is obligated under Minnesota law to construe the policy in light of how a "reasonable person in the position of the insured would have understood" the policy. *Canadian Universal,* 258 N.W.2d at 572; *Soo Line,* 694 N.W.2d at 113.

Accordingly, the Court holds that, based on the language of the IPE, an insured would reasonably understand that losses related to a series of wrongful acts would be allocated to the policy period in which the first of those acts occurred. Because the infringing acts challenged in the *Maritz* suit allegedly began in November 1997, the Court holds that the losses incurred by Carlson in defending and settling that suit are attributable to the 1997–1998 policy period.

### C. Nature and Number of "Wrongful Acts" at Issue in Maritz

To this point, the Court has held that Subsection E of the IPE aggregates *related* wrongful acts—both those that occur during the policy period and those that occur outside of the policy period— and that losses occasioned by a series of *related* wrongful acts are assigned to the policy period in which the first of those acts occurred. The Court must now determine *how* related two or more wrongful acts must be before they can be aggregated under Subsection E. Carlson asks this Court to rule that all of the acts that gave rise to the *Maritz* suit were sufficiently related to be aggregated into one "wrongful act" under Subsection E. National Union naturally resists Carlson's characterization, as the more deductibles that Carlson must pay—and the more times that Royal's first-level excess policy must respond—the less money that National Union will have to pay under its second-level excess policies.

Subsection E of the IPE aggregates only those wrongful acts that "involv[e] the same intellectual right and covered Product." *See, e.g.,* Policy Stip. Tab 1 at P00016. Whether wrongful acts are sufficiently related to be aggregated under Subsection E thus depends on the answers to two questions: (1) Do the wrongful acts involve the same "intellectual right"? and (2) Do the wrongful acts involve the same "covered product"? The Court will address each question in turn.

#### 1. Number of "Intellectual Rights"

No one disputes that the *Maritz* suit involved two patents. Carlson, however, argues that those two patents covered only one "intellectual right." Carlson SJM at 18–22; Carlson Reply at 14 n. 11. The Court agrees.

The IPE does not define "intellectual right." But at least with respect to patent infringement, the scope of the term seems fairly clear. A single suit for infringing two patents covering very different inventions (say, a heating element and an electrical plug) would involve two different intellectual rights, even if a single product (say, a space heater) infringed both patents. At the same time, a suit for infringing a single patent would involve only one intellectual right, even if multiple claims of

that single patent were asserted against the accused product (as they typically are). This is so even though infringement must be assessed claim by claim (and, for each particular claim, limitation by limitation). Based on the nature of patents and patent litigation, no policy holder and no insurer would expect that each separate claim in a single asserted patent would be treated as a different "intellectual right" under the IPE.

In the *Maritz* suit, one of the two patents asserted against Carlson (the '695 patent) was a continuation of the other (the '100 patent)—that is, both patents resulted from the same initial application. Carlson SJM App. M at CMG02500. The two patents share the identical written description and drawings; they differ only in their claims. Carlson SJM at 19. Such continuation patents are common. *See* Manual of Pat. Exam. Proc. § 201.07.

The Court is not prepared to—and need not—declare that, for purposes of the IPE, every continuation patent necessarily involves the same "intellectual right" as a related patent. In the *Maritz* suit, however, the patentee agreed to file a so-called terminal disclaimer with respect to the '695 patent. Carlson SJM App. R at 10–11. Indeed, the patentee argued that a de facto terminal disclaimer already existed. *Id.* Based on the patentee's willingness to file a terminal disclaimer as to the '695 patent, the Court finds that the '100 patent and the '695 patent covered the same intellectual right.

Terminal disclaimers are a means of overcoming what is called "non-statutory double patenting," a doctrine under which a continuation patent can be held to be obvious (and therefore invalid) in light of a related patent that issued earlier from the same application as the continuation patent. *See Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1377–78

(Fed.Cir.2003). By means of a terminal disclaimer, the patentee gives up ("disclaims") any portion of the continuation patent's term that exceeds the term of the related patent. *Id.*; 37 C.F.R. 1.130; Manual of Pat. Exam. Proc. § 718. As a result, the two patents are effective for the exact same length of time. A terminal disclaimer is a concession by the patentee that two patents that resulted from the same application should be treated as a single patent, effective for a single patent term. Put differently, the claims of the continuation patent are treated *as if* they appeared in the first patent.

If the continuation claims *had* appeared in the first patent, no one could dispute that all of the claims in that one patent would have represented a single "intellectual right" under the IPE. Because a terminal disclaimer constructively consolidates two patents, the result should be no different where a patentee files, or is prepared to file, a terminal disclaimer as to a continuation patent. Accordingly, the claims of the '100 patent and the claims of the '695 patent together constitute a single "intellectual right" under the IPE.

2. Number of "Covered Products"

Under Subsection E of the IPE, only wrongful acts that involve "the same ... covered Product" can be aggregated into a single wrongful act. *See, e.g.,* Policy Stip. Tab 1 at P00016. The IPE defines a covered product as "any product ... sold or any process used" by the policy holder. *Id.*

Carlson argues that the *Maritz* suit involved only one "covered Product." Carlson SJM at 22–26. Carlson concedes that the TravPass incentive program and the BOE incentive program may have appeared to be separate products to Carlson's customers. But Carlson relies heavily on the fact that the IPE defines a

"covered Product" to include not just "any product ... sold," but also "any process used." *Id.* at 24; Carlson Reply at 14 & n. 12. Carlson argues that the TravPass and BOE incentive programs used the same patented "process" and therefore are constructively the same "covered Product" for purposes of the IPE. *Id.*

National Union disagrees. According to National Union, there is a factual dispute over whether TravPass and BOE involve different infringing processes. NU Opp. Carlson SJM at 22–26. The evidence on which National Union relies, however, fails to create any genuine issue of fact.

First, National Union emphasizes that TravPass and BOE were operated on two different computer systems. NU Opp. Carlson SJM at 22–23. But this is not true in any meaningful way. If TravPass operated on one system and BOE operated on another, that would be some evidence tending to show that they used different processes. In fact, however, they *both* operated on a first computer system from 1998 to 2000, then they *both* operated on a second computer system (called "Card-Link") from 2000 on. *Id.* at 23. Far from suggesting that TravPass and BOE used different processes, this suggests that they used the same process—and that, if that process changed over time, it changed in the same way for both TravPass and BOE.

Second, National Union relies on differences between TravPass and BOE identified in a Carlson document that outlines the "processes" involved in each of the different award programs (TravPass, BOE, and others) running on Carlson's CardLink computer system. *Id.* at 23–26. These differences, however, are irrelevant to the question of coverage under the IPE.

The IPE must be interpreted in light of its function. As it relates to this case, the function of the IPE is to provide coverage for patent infringement. Under the IPE,

infringement losses arising from a single "process used" by the policy holder are treated as arising from a single "wrongful act." The key question, then, is whether the policy holder's activities involve the *same infringing process*, regardless of what *other* processes those activities might *also* involve.

To illustrate: Suppose that a policy holder who owns a restaurant—call it Eggcorp—infringes a method patent having two steps. Step 1 reads, "mix eggs and milk." Step 2 reads, "scramble mixture." Eggcorp serves the resulting infringing scrambled eggs in three ways: (1) by themselves; (2) with ketchup; and (3) with cheese. In the second and third cases, the scrambled eggs involve an additional step not mentioned in the patent (adding ketchup or adding cheese). But all of the scrambled-egg dishes—the plain eggs, the eggs with ketchup, and the eggs with cheese—infringe the same patent. In other words, Eggcorp practices the "same process"—steps 1 and 2 of the method patent—in making all three dishes, even though making the eggs with ketchup *also* involves a third step (adding ketchup), as does making the eggs with cheese (adding cheese).

A similar point can be made here. The processes identified in the CardLink document on which National Union relies are like adding ketchup or cheese to our hypothetical scrambled eggs. National Union has failed to show how the "process" differences identified in the CardLink document are relevant to the *patented* process that both TravPass and BOE infringed. The mere fact that certain differences between TravPass and BOE are associated with what are labeled "processes" does not mean that TravPass and BOE used different processes in any sense that matters under the IPE. Put another way, as long as both TravPass and BOE used the set of

steps that make up the patented process—and therefore infringe some of the same asserted process claims—they use the same process under the IPE, even if TravPass used *additional* steps that BOE did not use, and even if BOE used *additional* steps that TravPass did not use.

The undisputed record evidence indicates that TravPass and BOE were accused of infringing the same patented processes. First, the settlement agreement between Carlson and Maritz does not distinguish between the two programs. Carlson SJM App. P. Instead, both are listed, without differentiation, as examples of what the agreement labels "Filtered Card Program[s]." *Id.* at 3. Second, Maritz's expert opined that both TravPass and BOE infringed claims 1, 7, 8, 9, 15, and 16 of the '100 patent. Carlson Reply App. B at 4–20. To the extent that these claims should be construed to cover processes or business methods—and National Union has not argued otherwise—there is no genuine dispute that TravPass and BOE were accused of employing the same patented processes (namely, the processes covered by those claims of the '100 patent).

In sum, the Court holds that all of the acts committed by Carlson which gave rise to the *Maritz* lawsuit "involv[ed] the same intellectual right and covered Product" for purposes of Subsection E of the IPE and therefore must be aggregated into a single wrongful act.

### D. Coverage of Enhanced Damages in Meridian

In one of its three partial summary-judgment motions, National Union asks this Court to rule that Carlson is not entitled to insurance coverage for a portion of the settlement in the *Meridian* lawsuit—specifically, for the $5 million designated as "enhanced compensatory damages" in the "Settlement Authority and Payment Agreement" (the "Settlement Authority Agreement"). *See* NU SJM Enh. D.; Carlson Opp. Enh. D.App. X (copy of agreement). Royal supports National Union's motion. Royal Resp. Nat'l Union Mot. Partial S.J. Enh. D. at 2–3 [Docket No. 110].

National Union makes two related arguments. First, National Union argues that the $5 million in "enhanced compensatory damages" are not covered "damages" as that term is defined in the primary insurance policies (to which the Royal and National Union policies follow form, at least with respect to this issue). Second, National Union argues that, even if the $5 million in "enhanced compensatory damages" are covered under the terms of the primary policies, those damages are uninsurable under Minnesota law because they are essentially punitive. NU SJM Enh. D. at 2. The Court agrees with National Union on both points.

### 1. Definition of "Damages"

The definition of "damages" in the IPE specifies both what the term includes and what the term excludes. That definition reads, in relevant part:

> "Damages" mean monetary sums paid to the claimant pursuant to either judgments or settlements negotiated as lost past profits and/or past royalties ... provided that Damages shall not include ... any such matters which are uninsurable under the law pursuant to which this policy shall be construed.

*See, e.g.,* Policy Stip. Tab 1 at P00016.

This definition distinguishes between two types of damages. It covers *all* money paid to a claimant "pursuant to ... [a] judgment[ ]," but it covers only *some* money paid to a claimant "pursuant to [a] settlement[ ]." Payments made pursuant to a settlement are covered only to the extent that the payments were for "lost past profits and/or past royalties."

Carlson argues that the sums it paid to settle the *Meridian* suit were pursuant to a judgment because "were it not for the underlying *Meridian* judgment, no labels would ever have been placed on the damages." Carlson Opp. Enh. D. at 12. Carlson is wrong. Carlson paid the disputed amounts pursuant to a settlement agreement. *Id.* App. W. A settlement agreement is not a judgment.

The question, then, is what portion of the payments made to settle the *Meridian* lawsuit were for "lost past profits and/or past royalties." Only that portion of the payments qualifies as "damages" covered by the IPE. Payments made for any other purpose are not defined as "damages" and therefore need not be paid by Royal or National Union.

■ National Union argues that $5 million of the settlement is not covered because that amount was designated "enhanced compensatory damages" in the Settlement Authority Agreement. *See* Carlson Opp. Enh. D.App. X at 3. The Settlement Authority Agreement was a contract among Carlson and its insurers that authorized Carlson to settle the *Meridian* case within agreed-upon parameters. According to National Union, the "enhanced compensatory damages" identified in the Settlement Authority Agreement correspond to the damages awarded by the district court in the underlying suit based on the jury's finding of willfulness. NU SJM Enh. D. at 20. Thus, says National Union, the disputed $5 million was for neither "lost past profits" nor "past royalties" and is therefore not covered. *Id.* at 12–14.

Carlson asks the Court to disregard the Settlement Authority Agreement and the underlying district-court judgment for various reasons, all unpersuasive. Least persuasive are Carlson's attempts to tug at the Court's heartstrings. Carlson com-plains about being "compelled" to accept the language in the Settlement Authority Agreement. Carlson does not actually argue that it signed the contract under duress, for the obvious reason that there is no hint that the insurers threatened harm to Carlson's executives or to the corporation if Carlson did not sign the agreement (the legal basis for a claim of duress, *see Bond v. Charlson,* 374 N.W.2d 423, 428–29 (Minn.1985)). Rather, Carlson seems to want to persuade the Court to feel sorry for it. Carlson has failed. Carlson is a large, multi-million-dollar corporation that made a calculated business decision that it was better off signing the Settlement Authority Agreement than not signing it. Like everyone else, Carlson must live up to its agreements.

The Court is also not moved by Carlson's attempts to blame National Union for the imposition of enhanced damages in the underlying *Meridian* lawsuit. According to Carlson, it "would never have even been liable for enhanced damages in the first place" if not for National Union's "dilatory tactics and its failure to act in good faith throughout the course of the underlying *Meridian* action." Carlson Opp. Enh. D. at 2. Carlson does not actually raise an unclean-hands defense. Rather, Carlson again appears to be trying to win the sympathy of the Court. Carlson has again failed. National Union is not to blame for the willfulness damages assessed in *Meridian.* It was Carlson, not National Union, that was found to have willfully infringed Meridian's patent.

Carlson further argues that the "enhanced compensatory damages" are really "compensatory" in nature and therefore should be treated like damages for lost profits or lost royalties. *Id.* at 13–14. But Carlson cannot duck the fact that it agreed to label a portion of its settlement *"enhanced* compensatory damages." In light

of the fact that the Settlement Authority Agreement related to an underlying patent lawsuit in which Carlson was required to pay both (un-enhanced) compensatory damages and willfulness damages, the Court agrees with National Union that the "enhanced compensatory damages" correspond to, and were paid in settlement of, the willfulness damages.

Damages for willful infringement under 35 U.S.C. § 284, though often measured as a multiple of compensatory damages (and capped at three times those damages), are punitive, not compensatory. *See Knorr– Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1348–49 (Fed.Cir.2004) (Dyk, J., concurring in part and dissenting in part) ("We have often recognized that enhanced damages awarded pursuant to 35 U.S.C. § 284 are a form of *punitive damages."* (emphasis added)). Accordingly, because Carlson's $5–million settlement payment for "enhanced compensatory damages" was not for "past profits and/or past royalties," that payment is not "damages" within the meaning of the IPE.

Finally, the Court rejects Carlson's argument that purported infirmities in the underlying *Meridian* judgment foreclose the Court from considering that judgment in determining whether some portion of the *Meridian* settlement was for non-compensatory damages. Carlson Opp. Enh. D. at 7–11. Carlson might have avoided paying damages for willful infringement if it had succeeded on appeal (and then, perhaps, on remand). But Carlson instead settled the *Meridian* suit. In so doing, Carlson agreed with the insurers who funded the settlement to label some of the settlement funds "enhanced compensatory damages" and to leave for another day the fight over whether those enhanced damages were covered under the relevant poli-

cies. That day has come, and Carlson has lost that fight.

### 2. Insurability Under Minnesota Law

 As explained above, the Court finds that the $5 million labeled "enhanced compensatory damages" paid by Carlson to settle *Meridian* was not for "past profits and/or past royalties" and therefore is not "damages" under the IPE. But even if that $5 million qualified as "damages" under the first clause of the IPE because it was for "past profits and/or past royalties," that same $5 million would be *disqualified* from being treated as "damages" under the IPE's second clause because that $5 million is "uninsurable under the law pursuant to which this policy shall be construed" (i.e., under Minnesota law).

 The Minnesota Supreme Court has observed that "in most instances public policy should prohibit a person from insuring himself against misconduct of a character serious enough to warrant punitive damages." *Wojciak v. N. Package Corp.*, 310 N.W.2d 675, 680 (Minn.1981). Therefore this Court finds, as it has in the past, that punitive damages are generally uninsurable as a matter of public policy under Minnesota law. *See U.S. Fire Ins. Co. v. Goodyear Tire & Rubber Co.*, 726 F.Supp. 740, 742 (D.Minn.1989), *aff'd* 920 F.2d 487, 490 (8th Cir.1990).

 Are damages for willful infringement under 35 U.S.C. § 284 "punitive" in the sense that renders them uninsurable under Minnesota law? The Court believes that the Minnesota Supreme Court, if faced with this question, would answer "yes." The Federal Circuit has stated that willfulness damages "may be awarded only as a penalty for an infringer's increased culpability, namely willful infringement or bad faith." *Beatrice Foods Co. v. New Eng. Printing & Lithographing Co.*, 923 F.2d 1576, 1579 (Fed.Cir.1991); *see also*

*Knorr–Bremse,* 383 F.3d at 1348 (Dyk, J., concurring in part and dissenting in part) (collecting cases). Willfulness damages are therefore the type of punitive damages that are uninsurable under Minnesota law.

Carlson argues that willfulness damages are sometimes compensatory rather than punitive. Carlson Opp. Enh. D. at 13–14. Carlson leans heavily on *Sharper Image Corp. v. Honeywell International, Inc.,* 222 F.R.D. 621 (N.D.Cal.2004), to support its position. But the language from *Sharper Image* that Carlson relies on is wrenched out of context; in fact, *Sharper Image* hurts Carlson more than it helps. *Sharper Image* observed that "[s]ome of the cases have suggested" that damages under § 284 may be partly compensatory, but went on to note:

> But it is clear that this purpose [i.e., ensuring full compensation] is *entirely secondary*—and cannot, standing alone, justify any enhancement of damages. The *primary purposes* of enhancing compensatory damages *are punishment and deterrence*—and the primary factors courts are to consider when deciding whether to enhance damages are designed to assess the degree of the defendant's culpability (rather than the extent of the plaintiff's loss).

222 F.R.D. at 628 n. 13 (emphasis added; citation omitted).

In short, Federal Circuit case law governing damages for willful infringement mandates that such damages be awarded only in cases of culpable behavior by defendants. Because willfulness damages are essentially punitive, they are uninsurable under Minnesota law. Carlson is therefore not entitled to indemnity from its insurers for the $5 million designated "enhanced compensatory damages."

### E. Impact of Defense Costs on Policy Limits

Royal's policy provides Carlson with $5 million in first-layer excess coverage. In one of its motions for partial summary judgment, National Union asks this Court to rule that defense costs do not erode this $5 million limit. *See* NU SJM Def. Costs. In other words, National Union argues that once Royal's excess policy is triggered, Royal must indemnify Carlson for up to $5 million in damages, *in addition to* the defense costs incurred by Carlson. Carlson and Royal both oppose National Union's motion. *See* Royal Opp. Def. Costs; Carlson Opp. Def. Costs. Indeed, Carlson and Royal have gone so far as to stipulate that, at least as to covered losses arising from patent-infringement suits, defense costs do erode the Royal policy's $5–million limit. Royal Opp.App. D at ¶ 11.

Under Minnesota law, contract interpretation is, in the first instance, a matter of law for the Court. *Watson,* 566 N.W.2d at 688. The Court will therefore examine the relevant policy language before turning to the effect (if any) of the stipulation between Carlson and Royal about the policy's meaning.

#### 1. Policy Language

The dispute over whether defense costs erode the Royal policy limit involves several provisions of the Royal policy. According to Carlson and Royal, the most important provision is the Advertisers Liability Limitation Endorsement ("ALLE"), which reads in relevant part:

> It is agreed that this policy does not apply to liability arising out of ... Patent ... infringement ... *[u]nless* such liability is covered by valid and collectible underlying insurance as listed in the Schedule of Underlying Insurance, for the full limit shown therein, and then only for such liability for which coverage

is afforded under said underlying insurance.

Policy Stip. Tab 9 at R093 (emphasis added). By the terms of this endorsement, coverage under the Royal policy for patent-infringement damages depends on coverage for those damages under the primary policy. If the primary policy covers patent-infringement damages and that coverage has been exhausted (i.e., the damages are covered "for the full limit shown" in the primary policy), then the Royal policy also covers those damages (i.e., the Royal policy provides coverage "for such liability for which coverage is afforded" under the primary policy).[10]

Because this endorsement makes coverage of patent damages under the Royal policy contingent on coverage under the primary policy, Carlson and Royal describe the Royal policy as "follow[ing] the form" of the primary policy. Royal Opp. Def. Costs App. D at ¶ 13. There is no dispute that, under the primary policy, defense costs do erode the policy limits. Carlson and Royal therefore argue that defense costs must also erode the policy limits under the Royal policy. Royal Opp. Def. Costs at 11–14; Royal SJM at 15–16; Carlson Opp. Def. Costs at 5–6.

If the ALLE stood alone, the Court would be inclined to agree with Carlson's and Royal's interpretation. But the ALLE is an endorsement to an umbrella policy, and that policy has three other provisions that relate, directly or indirectly, to coverage of defense costs: (1) the coverage-granting clause in the insuring agreement; (2) an endorsement entitled "Defense Settlement Amendatory Endorsement" ("Defense Endorsement") that

defines the term "Ultimate Net Loss" as used in the coverage-granting clause; and (3) the "Defense Supplemental Payments Provision" ("Defense Provision") in the insuring agreement.

First, the insuring agreement extends coverage as follows:

1. Coverage

The Company agrees to pay on behalf of the Insured the Ultimate Net Loss, in excess of the applicable Underlying or Retained Limit, which the Insured shall become legally obligated to pay because of:

(a) Personal Injury

(b) Property Damage

(c) Advertising Liability

caused by an Occurrence which takes place during the policy period anywhere in the world.

Policy Stip. Tab 9 at R103 (Section II.1). This clause establishes that Royal will insure three types of losses—losses arising from personal injury, property damage, and advertising liability—and will pay the "Ultimate Net Loss," as defined elsewhere in the policy.

The term "Ultimate Net Loss" is defined in the insuring agreement, but that definition is superseded by the definition in the Defense Endorsement, which reads:

Ultimate Net Loss means: the total sums actually paid or payable as damages in settlement of a claim with the written consent of the Company or in satisfaction of a judgment for which the Insured is legally liable after making deductions for all other recoveries, salvages, and other insurances (whether recoverable or not) other than underly-

---

10. The Court believes that the ALLE could be read to provide that Royal's limit of liability under the ALLE is equal to the limit of liability of the underlying insurance. Because the IPE in the primary policy provides only $1 million in coverage, on this reading Royal would have exposure of only $1 million. All of the parties agree, though, that the $5–million limit in Royal's umbrella policy applies to damages covered under the ALLE.

ing insurance and excess insurance purchased specifically to be in excess of this policy.

Ultimate Net [L]oss does not include

(a) costs and expenses which an underlying insurer has paid or incurred or is obligated to pay to or on behalf of the Insured,

(b) office costs and expenses of the Insured and salaries and expenses of employees of the Insured,

(c) general retainer fees of counsel retained by the Insured, or

(d) investigation, adjustment, appraisal, appeal and *defense costs* paid or incurred by the Insured, with respect to damages covered hereunder, *which are payable by the Company in addition to the applicable limit of liability of this policy.*

Policy Stip. Tab 9 at R038 (line breaks and emphasis added). Notably, the Defense Endorsement's definition of Ultimate Net Loss differs from the definition in the insuring agreement in exactly one respect: how defense costs are treated.

According to the definition in the insuring agreement, Ultimate Net Loss includes everything listed in the Defense Endorsement's definition quoted above (i.e., "the total sums" etc.) "and *also includes ... defense costs* paid by the Insured with respect to damages covered hereunder." *Id.* at R105 (Section IV.6) (emphasis added). The Defense Endorsement, however, strikes this language about defense costs from the definition of Ultimate Net Loss. Instead, the Defense Endorsement addresses defense costs in a new subpart (d), which states that defense costs (and similar costs) "are payable by the Company *in addition to*" the policy limits. It is obvious that the Defense Endorsement's main purpose is to establish that defense costs (and similar costs), which were covered before the endorsement's execution but

eroded policy limits, are still covered under the endorsement but do *not* erode policy limits.

Royal, however, resists this natural reading of the Defense Endorsement. Royal points to yet another policy provision related to defense costs, the Defense Provision in Section II.2 of the insuring agreement. Royal Opp. Def. Costs at 8, 15–16. The Defense Provision immediately follows the coverage-granting clause found in Section II.1 and quoted above.

The Defense Provision has two subsections. Subsection A relates to claims covered by Royal but not covered by underlying insurance. Subsection B relates to claims covered by underlying insurance. As to claims covered by Royal but not covered by underlying insurance, Subsection A obligates Royal to defend them. As to claims covered by underlying insurance—like the claims against Carlson in *Maritz* and *Meridian*—Subsection B provides:

When underlying insurance ... does apply to an Occurrence, [Royal] shall have no duty to pay defense, investigations, settlement or legal expenses covered by such underlying insurance; however, [Royal] shall have the right and opportunity to associate with the Insured and any underlying insurer in the defense and control of any claim or suit reasonably likely to involve [Royal] under this policy.

Policy Stip. Tab 9 at R103.

According to Royal, the Defense Provision *alone* is the source of any obligation on Royal's part to pay defense costs under the insuring agreement. Royal Opp. Def. Costs at 14–16. Royal further argues that under Subsection B of the Defense Provision—which applies because the damages at issue in this suit are covered by underlying insurance—Royal has no duty to pay

Carlson's defense costs based on the insuring agreement alone. *Id.* at 16 n. 6. Rather (says Royal), Royal's obligation to pay defense costs arises solely from the ALLE, and the Court should therefore look only to the ALLE to determine whether defense costs erode Royal's policy limits. *Id.* at 14 ("[A]bsent the ALLE, Royal would owe *no obligation,* whatsoever, for Carlson's defense costs under the Royal policies.").

Royal badly misreads the insuring agreement. First, the Defense Provision is *not* the sole source under the insuring agreement of Royal's obligation to pay defense costs. Recall that the definition of "Ultimate Net Loss" in the original insuring agreement (setting aside the Defense Endorsement) unambiguously *includes* defense costs. If the Defense Provision were struck altogether from the original insuring agreement, Royal would still be obligated, by virtue of the definition of Ultimate Net Loss, to pay defense costs whenever it indemnified the policy holder for a covered loss.

The Defense Endorsement did not magically transform the Defense Provision into the source of Royal's defense-cost obligations. Rather, the Defense Endorsement merely changed how defense costs would be counted in relation to the Royal policy limits. Before the Defense Endorsement, defense costs eroded policy limits because they were included in the definition of "Ultimate Net Loss"; after the Defense Endorsement, defense costs do not erode policy limits because, again under the definition of "Ultimate Net Loss," defense costs are payable "in addition to" the policy limit.

Second, even if the Defense Provision alone created Royal's defense-cost obligations (and it does not, as just explained), the Defense Provision cannot be read as Royal advocates. The Defense Provision

does not say, "When underlying insurance applies to an Occurrence, Royal shall have no duty to pay defense expenses." Instead, it says that, as to occurrences covered by underlying insurance, Royal shall have no duty to pay "defense ... expenses *covered by* such underlying insurance." What about defense expenses *not covered by* such underlying insurance? The Defense Provision alone does not answer the question.

 But the Defense Provision and the insuring agreement's coverage-granting clause, when read together, do answer the question. As noted above, because the coverage-granting clause incorporates the definition of Ultimate Net Loss, that clause obligates Royal, in general, to pay defense costs for covered losses. Under the insuring agreement, defense costs erode Royal's policy limits; under the policy as amended by the Defense Endorsement, defense costs are payable in addition to policy limits.

The Defense Provision merely creates an exception to the background rule—created by the insuring agreement—that Royal must pay defense costs for covered losses. Under the Defense Provision, Royal need not pay such defense costs if they are covered by underlying insurance. Royal must, however, pay defense costs that are not covered by underlying insurance—because, for instance, the defense costs erode underlying policy limits and also exceed those limits. Put another way, the Defense Provision relieves Royal of the obligation to pay *certain* defense costs, but it does not otherwise abrogate the background rule established by the coverage-granting clause that Royal must pay defense costs for covered losses.

The Court therefore rejects Royal's interpretations of the Defense Provision and the Defense Endorsement. Royal makes

one other argument, however, that the Court must address. Royal contends that the definition of "Ultimate Net Loss"—a definition that was central to the preceding discussion—is irrelevant in this case because the ALLE does not define Royal's obligations in terms of Ultimate Net Loss. Royal Opp. Def. Costs at 16–17. Royal notes that the Ultimate Net Loss is payable under the insuring agreement's coverage-granting clause for three types of liability: (1) personal injury; (2) property damage; and (3) advertising liability. *Id.* at 17. Because (says Royal) the patent-infringement damages covered under ALLE are none of these three kinds of damages, the definition of Ultimate Net Loss is irrelevant to coverage under the ALLE.[11] *Id.* at 7, 17.

Royal's proposed approach is creative but unsupportable. Recall that "ALLE" stands for "Advertisers Liability Limitation Endorsement." The function of the endorsement, as its title reveals, is to clarify what is included in covered "advertising liability," the third of the three types of damages covered under the insuring agreement.[12] It is well known that policy holders have attempted with varying success to shoehorn coverage for patent-infringement damages into advertising-liability clauses in CGL policies. *See* Jason A. Reyes, *CGL Insurance Coverage for Patent Infringement*, 2 B.U. J. Sci. & Tech. L. 14 (1996).

The ALLE is directed to that practice and establishes a basic rule: Patent-infringement damages are not covered under "advertising liability." The ALLE then makes an exception to that rule: Patent-infringement damages are covered under "advertising liability" if they are covered by underlying insurance. Notably, the underlying Reliance policy not only covers patent-infringement damages under the IPE, it also includes an endorsement that *defines* "advertising injury" as "[i]nfringement of patent, copyright, title or slogan." Policy Stip. Tab 2 at P00086 (Endorsement 6, Advertising Injury Definition).

Because patent-infringement damages, if they are covered at all by Royal, are covered as advertising liability, the Royal policy's definition of Ultimate Net Loss applies to damages payable under the ALLE. And that definition establishes that defense costs are payable by Royal in addition to Royal's policy limits.

### 2. Carlson–Royal Stipulation

▮ Royal and Carlson emphasize that they have actually stipulated that Carlson's defense costs for the *Maritz* and *Meridian* suits do erode Royal's policy limits. Royal Opp. Def. Costs at 24–25; Carlson Opp. Def. Costs at 7–8. They ask the Court to construe any ambiguity in favor of their agreed-upon intent. They further ask the Court to disregard the entreaties of National Union, whom they regard as a "stranger" to the contract.

It is of course true that, under Minnesota law, insurance policies must be interpreted to give effect to the intent of the parties. *Nathe Bros.* 615 N.W.2d at 344. But it is equally true that contract inter-

---

11. Indeed, according to Royal it is "undisputed that the *Maritz* and *Meridian* suits do not seek damages because of 'personal injury,' 'property damage' or 'advertising liability' as those terms are defined in the policies issued by Royal." Royal Opp. Def. Costs at 7.

12. The Court recognizes that the ALLE refers to *"Advertisers* Liability" while the insuring agreement refers to *"advertising* liability." In a carefully drafted contract, this difference might be meaningful. By this point, however, no one could regard the Royal policy as carefully drafted. There is no difference between "Advertisers Liability" and "advertising liability."

pretation is, to some extent, objective. When the language of an insurance policy is clear and unambiguous, the language must be given its "usual and accepted meaning." *Widness*, 635 N.W.2d at 518. And policy language must be interpreted in light of what a "reasonable person" in the insured's position would have understood by the language. *Canadian Universal*, 258 N.W.2d at 572; *Soo Line*, 694 N.W.2d at 113.

These principles necessarily limit the freedom of contracting parties to assign idiosyncratic meaning to contract language, at least once the contract becomes the subject of litigation. As Oliver Wendell Holmes, Jr., observed over a century ago in a dispute over reformation of a deed that inaccurately described the property conveyed:

> [Y]ou cannot prove a mere private convention between the two parties to give language a different meaning from its common one. It would open too great risks if evidence were admissible to show that when they said five hundred feet they agreed it should mean one hundred inches, or that Bunker Hill Monument should signify the Old South Church.

*Goode v. Riley*, 153 Mass. 585, 28 N.E. 228, 228 (1891) (citations omitted). More recently, the Eighth Circuit recognized this principle in construing a collective-bargaining agreement, remarking: "Were parties to a contract able to alter the usual definition of an unambiguous, written term by reference to their past practices or their own private agreement, reason could not justify the written word." *Cent. States, Se. & Sw. Areas Pension Fund v. Indep. Fruit & Produce Co.*, 919 F.2d 1343, 1351–52 (8th Cir.1990).

If Carlson and Royal intended that defense costs for patent infringement erode Royal's policy limits, they needed to express that intent in the language of the policy, not in a stipulation filed in connection with litigation over the meaning of the policy. As the Court reads it, the Royal policy unambiguously provides that defense costs are payable in addition to policy limits. The implausibility of Royal's arguments to the contrary only reinforces the Court's conclusion.

In addition, the Court is not convinced that National Union is so much a "stranger" to the agreement between Royal and Carlson that National Union's arguments are irrelevant. National Union provided Carlson with excess insurance that followed the form of Royal's policy. As a follow-form insurer, National Union has a direct interest in the construction of Royal's policy, and National Union entered into its contract with Carlson in light of that policy and in reliance on its terms. National Union agreed to follow form to the Royal policy as written, not as secretly imagined by Carlson and Royal. This is another reason why Royal's policy must be interpreted objectively.

In sum, the Court holds that, to the extent that Royal is obligated to reimburse Carlson for defense costs incurred in defending the *Maritz* and *Meridian* lawsuits, that reimbursement does not erode the Royal policy limits.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. The motion for partial summary judgment of plaintiff Carlson Marketing Group, Inc. [Docket No. 80] is GRANTED IN PART AND DENIED IN PART as set forth in the memorandum opinion accompanying this order.

2. The motion for partial summary judgment of defendant Royal Indemnity Company [Docket No. 82] is GRANTED IN PART AND DENIED IN PART as set forth in the memorandum opinion accompanying this order.

3. The three motions for partial summary judgment of defendant National Union Fire Insurance Company of Pittsburgh are disposed of as follows:

 a. The motion with respect to defense costs [Docket No. 61] is GRANTED.

 b. The motion with respect to "trigger and allocation" [Docket No. 73] is DENIED.

 c. The motion with respect to enhanced damages [Docket No. 86] is GRANTED.

## APPENDIX A

Excerpt from rough draft of transcript of summary-judgment hearing held October 10, 2006

agree that that was—it was not intended to change the limits of five million.

THE COURT: Right.

MR. BALDWIN: Since nobody disagrees with that.

THE COURT: Nobody wants you not to give your four million dollars away so I won't be the one to insist. Right.

MR. BALDWIN: Anyway, you know, the ALLE is how we get the intellectual property coverage. Royal is aware of the fact that the wrongful act limit of liability is not set forth in its policy. We have presented extrinsic evidence, undisputed extrinsic evidence on what both Carlson and Royal intended, that there would be a five million wrongful act limit of liability. So, therefore, we believe that there is, in fact, a five million wrongful act limit of liability, and that that would be the maximum that we should owe for the merits claim, as well as for the meridian claim.

We can also get to that result in a different way, and that is through the non-accumulation of liability provision, which is—

THE COURT: Let me ask you about that. I take it that the non-accumulation provision turns on whether you issued one five-year policy or five one-year policies, correct?

MR. BALDWIN: That's correct.

THE COURT: The one thing I was wondering about is, I am sorry, I am just looking for—I have so many notes here. The provision starts it is agreed that if any loss is also covered in whole or in part under any other excess policy issued to the insured prior to the inception date hereof and is there—so the language explicitly ties us to the inception date. The inception date of the first inception date is obviously July 1st, 1997.

MR. BALDWIN: 1992 is actually when the policy was initially issued to Carlson. It was in 1997 that the intellectual property coverage was added.

THE COURT: Is the policy number of the five-year prepaid whatever we want to call it, is that policy number the same as the '92 policy number?

MR. BALDWIN: Policy number never changed.

THE COURT: So that one policy number went from—that's good. Did you say that in the brief? That would have been a good argument on your side. Even they admit there is one policy from '92 to 2003, even though the number is the same.

MR. BALDWIN: In fact, Your Honor, you can look at the copy of the policy that I have attached to my demonstrative ex-

hibit and it—on the declarations page it actually shows July 1, 1992 with the policy number and then—

THE COURT: Okay. So this policy number never changed.

MR. BALDWIN: It never changed, but over—

THE COURT: What about insertion dates? Where does one find the inception dates?

MR. BALDWIN: One does not look— there is no definition of an inception date.

THE COURT: You have to take the first one and the word annual and just—

MR. BALDWIN: Well, I think that you look at how the policy was drafted and how it was intended to apply on an annual basis and we would maintain that it incepted July 1, 1992 to July 1, 1993, it incepted again in July, it incepted every year on July 1st. That would be our position. Pair par the prepaid premium does not overcome the fact that it could have been cancelled and that the premiums and the conditions would be reviewed on an annual basis. I think it's a matter of semantics, Your Honor, as to whether you look at this as having an annual inception date which is the position that both Royal and Carlson agree upon, as well as—or whether you look at, well, you know, technically it incepted in 1992. We have set forth at least one case that did address the situation similar to this. It's from Louisiana where the court did tackle with the issue of do you consider a renewed policy a separate policy or do you consider it a new policy. The court in the Coreville decision did say you consider it a new policy.

THE COURT: Okay. Anything more you want to—

MR. BALDWIN: No. Well, the only other point I would raise is that Carlson

did, in fact, agree that defense costs are within limits. They just agreed they wouldn't argue that today.

THE COURT: Okay.

MR. BALDWIN: Thank you.

THE COURT: The spirit of agreement is just too bad we couldn't have a little more of it, you could settle it all.

MR. BALDWIN: I like that one million argument, Your Honor.

THE COURT: It seems to me that's what it says.

Was this thing drafted just—is this a new—this IPE, was it just drafted between Royal and Carlson or was it something that Royal has in other policies?

MR. BALDWIN: You mean the advertiser's liability limitation endorsement?

THE COURT: It would have been drafted between—

MR. BALDWIN: Reliance initially.

MR. LUKE: I realize I am intruding on Mr. Fink. I have gone back and looked at this and I think I can explain the confusion. I would at least like to take a

APPENDIX B

Excerpt from rough draft of transcript of summary-judgment hearing held October 10, 2006

be required to ever actually trigger coverage.

The last point on allocation, I agree with the court the policy doesn't squarely address that. We spent a lot of time looking at that issue and expected that the court would have a question on that. I will tell you that where I came down on it is is this: I don't believe this court has to resolve that issue because it's not squarely presented here on facts that will bring that into focus. The simple fact of the matter is both the more its and meridian claim are

bell within the single limit. That's what 1 E does. Carlson doesn't care what policy they put it in. Carlson doesn't say it should be allocated across the six policies. There are techniques that can be used or resort to legal principle if that were necessary, but in this case it isn't. I would suggest the court doesn't have to reach that issue in this case.

THE COURT: Thank you. Okay. Anything else? Are we ready to move on? What are we talking about next? The enhance the damages?

MR. BALDWIN: Right. March March Robert Marshall for National Union. Are we separately addressing defense costs or would you like to do enhanced damages next?

THE COURT: We can do enhanced damages. I will have to tell both sides I think on enhanced damages it's a pretty straightforward argument on both sides. I thought it